

# UNITED STATES DISTRICT COURT

# DISTRICT OF SOUTH DAKOTA

# CENTRAL DIVISION

*****************************************************************************************

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | CR. 10-30050-RAL |
| Plaintiff, | * | |
| -vs- | * | REPORT AND RECOMMENDATION FOR DISPOSITION OF MOTION TO SUPPRESS |
| DONOVAN TOM YAZZIE, | * | |
| Defendant. | * | |

*****************************************************************************************

## SUMMARY

An infant was severely injured while in the care of Donovan Yazzie. Federal and tribal agents suspected criminal conduct occurred and talked to Yazzie about what happened several times over a two-day time period. During these conversations, Yazzie made statements and provided agents with evidence he now seeks to suppress. Because the statements and evidence were not illegally obtained, the Court recommends that Yazzie's suppression motion be denied.

## BACKGROUND

A.U.K., a 10-month old girl, sustained a serious head injury during the afternoon of April 16, 2010. At the time, Yazzie was babysitting A.U.K. and three other children at Bernard Uses Knife's (Yazzie's father-in-law) home in Eagle Butte, South Dakota.

Oscar Ramirez, an FBI Agent, and Larry LeBeau, a detective with the Cheyenne River Sioux Tribe, responded and began investigating the matter. They initially interviewed Yazzie in LeBeau's vehicle outside of Bernard's home, where Yazzie had been living. Ramirez requested permission to view the call log on Yazzie's cell phone. Yazzie agreed and handed Ramirez the phone with the log already displayed. Ramirez then looked at the log, made a few notations and gave the phone back to Yazzie. At the conclusion of the interview, Ramirez asked for consent to search the house, including Yazzie's bedroom. Yazzie said that was fine and signed a consent to search form. All told, Yazzie was in the vehicle with agents for a little more than an hour.

That same day, agents returned to the house and searched the inside of it. Before doing so, they obtained written consent from Ashley Uses Knife, who was also living in the house, and from Bernard. During the search, Yazzie showed agents where A.U.K. fell and hit her head and described what he had been doing when this happened and beforehand. Agents were in the house for approximately 40 minutes, less than 5 minutes of which involved conversing with Yazzie.

The next day, April 17, agents conducted another interview with Yazzie, this time at the tribal police department in Eagle Butte. Yazzie's wife, Louise Yazzie, transported him there after Bernard had called her at home and said that agents wanted to talk to Yazzie a second time. After a while, Ramirez asked to see Yazzie's cell phone call log. As he had done before, Yazzie opened up the log directory of the phone – containing calls that had recently been made – and gave Ramirez the phone. Ramirez read the log, took down

what appeared in it and returned the phone to Yazzie. During the interview, Yazzie again tried to explain and demonstrate what took place the previous day. He remained with agents for about an hour and a half, 30 minutes of which were videotaped with his consent.

Later in the day, agents interviewed Yazzie a fourth time – for 15 to 20 minutes – at his home. This interview occurred in conjunction with a follow-up search of the house. While with agents, Yazzie pointed out where he and A.U.K. had been at various times and attempted to describe what had transpired and how much force he used while playing with the child.

Roughly two hours or so afterward, LeBeau arrested Yazzie on tribal charges. Ramirez had told Yazzie, at least three times earlier, that Yazzie would not be arrested immediately following the interview and that any arrest decisions would be made by the United States Attorney's Office sometime in the future. Although LeBeau did not plan to arrest Yazzie, LeBeau changed his mind after talking to social services, the tribal prosecutor and judge, Ramirez and an Assistant United States Attorney. Because Yazzie's own safety and that of the other children in the home were at risk if he was allowed to return there, and because he had no place to go and had commented about leaving to go to Arizona, LeBeau decided to arrest Yazzie for child abuse.

Yazzie now seeks to suppress the statements and demonstrations he gave while being interviewed, alleging that they were involuntary and obtained in violation of the

dictates of *Miranda v. Arizona.*[1] He likewise seeks to suppress, on Fourth Amendment grounds, all evidence derived from the alleged searches of his cell phone.

## NO CELL PHONE "SEARCHES" OR FOURTH AMENDMENT VIOLATION

Yazzie initially asserts that his Fourth Amendment rights were violated when Ramirez illegally searched and seized evidence from his cell phone on one or more occasions. In particular, he says that evidence obtained from his phone on April 16 and 17, was done so without his permission or a warrant and must be suppressed. He likens his phone to a personal computer – that he has a right of privacy in – and argues that Ramirez illegally searched and seized information – call log data – that was constitutionally protected.

### A. Significant Facts

Contrary to Yazzie's allegations, Ramirez did not "demand" that Yazzie turn over the cell phone, but rather asked for permission to view the phone's call log, which Yazzie agreed to do. And, Ramirez did not rummage through the phone to see what he could find. In fact, Ramirez never operated or pressed any buttons on the phone when he had it on April 16th and, at best, may have scrolled the call log the following day. One thing is for sure: Ramirez at no time ever attempted to access any other directories or applications on the phone; instead, he limited his observations solely to the log that Yazzie himself had called up and put on the phone screen.

---

[1] 384 U.S. 436 (1966).

**B. No Search**

In *Smith v. Maryland*[2], the United States Supreme Court held that the use of a pen register – a device that records numbers dialed from a phone line – does not constitute a "search" for Fourth Amendment purposes.[3] The Court initially observed that people do not have a subjective expectation of privacy in numbers that they dial because they "realize that they must 'convey' phone numbers to the telephone company, since it is through telephone company switching equipment that their calls are completed.[4] But, the Court went on to say, even if there is a subjective expectation, it is not one that society is prepared to recognize as reasonable because "a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties."[5] Importantly, the Court distinguished pen registers from more intrusive surveillance techniques on the ground that "pen registers do not acquire the *contents* of communications," but rather, obtain only the addressing information associated with phone calls.[6]

---

[2] 442 U.S. 735 (1979).

[3] 442 U.S. at 745-46.

[4] *Id*. at 742.

[5] *Id*. at 743-44.

[6] *Id*. at 741; *see also id.* at 743 ("Although petitioner's conduct may have been calculated to keep the *contents* of his conversation private, his conduct was not and could not have been calculated to preserve the privacy of the number he dialed."); *c.f. Katz v. United States*, 389 U.S. 347 (1967) (legitimate expectation of privacy exists in *contents* of phone conversation).

Just as there is no reasonable expectation of privacy in phone numbers called – because they are voluntarily turned over to third parties[7] – there may be no reasonable privacy expectation in a cell phone's recent call directory or log.[8] Where a defendant fails to show that he has a reasonable expectation of privacy in the call numbers and log searched, or that the numbers and log disclosed more than the "addressing information" that would be revealed by a pen register, his claim of an unreasonable search also fails.[9]

Yazzie has this problem here.[10] He has not carried his burden and demonstrated that he has a reasonable expectation of privacy in his cell phone call log or that Ramirez intruded into a "constitutionally protected area within the lodestar of *Katz*."[11] The log Ramirez viewed was limited to "addressing information" and did not include the *contents* of any communications Yazzie purportedly had with others.[12] Moreover, Yazzie's conduct

---

[7] *See Smith*, 442 U.S. at 741-45.

[8] *See United States v. Maldonado*, No. 09-40031-01/02-SAC, 2009 WL 2760798 at *13, (D.Kan. Aug. 26, 2009).

[9] *Id.*

[10] *Id.*

[11] 389 U.S. at 351-53; *see United States v. Fierros-Alavarez*, 547 F.Supp.2d 1206, 1210-11 & N. 3 (D. Kan. 2008); *United States v. Perez-Alanzo*, No. CRIM. 03-221(1), (2)A, 2003 WL 22025863 at *3 (D. Minn. Aug. 27, 2003); *see also Minnesota v. Carter*, 525 U.S. 83, 88 (1998); *Rakas v. Illinois*, 439 U.S. 128, 143 (1978)

[12] *Compare City of Ontario v. Quon*, 130 S.Ct. 2619, 2626, 2630 (2010) (where Supreme Court assumed, but did not decide, that employee had a reasonable expectation of privacy in the *content* of the text messages sent on a pager provided to him by his employer); *United States v. Finley*, 477 F.3d 250, 259 (5th Cir.) (reasonable expectation of privacy found where *both* call records and text messages on cell phone

(continued...)

and interactions with Ramirez were not calculated to preserve the privacy of the information in the call log. Regardless, when Yazzie used his cell phone, he voluntarily conveyed certain information to his phone carrier and "exposed" that information to a third party, akin to an operator, he could claim no legitimate expectation of privacy to.[13] Because Yazzie entertained no actual expectation of privacy in the call log of his phone, and, even if he did, his expectation was not "legitimate", Ramirez's surveys of the log were not "searches" that implicated the Fourth Amendment.[14]

[12](...continued)
searched), *cert. denied*, 549 U.S. 1353 (2007).

[13]*Compare United States v. Meador*, No. 1:06 CR 134 CDP DDN, 2008 WL 4922001 at *12 (E.D. Mo. Jan. 7, 2008) (reasonable expectation of privacy in call log *and* address book because address book information is not transmitted to cellular phone providers).

[14]*Rehberg v. Paulk*, 611 F.3d 828, 842-43 (11th Cir. 2010), *petition for cert. filed*, 79 U.S.L.W. 3377 (U.S. Dec. 13, 2010) (No. 10-788, 10A341); *United States v. Velasqnez, No. CR 08-0730 WHA*, 2010 WL 4286276 at **4-5 (N.D. Cal. Oct. 22, 2010); *Fierros-Alavarez*, 547 F.Supp.2d at 1210-11 & n. 3 *United States v. Valdez*, No. 06-CR-336, 2008 WL 360548 at *3 & n. 3 (E.D.Wis. Feb. 8, 2008); *see also United States v. Forrester*, 512 F.3d 500, 509-11 (9th Cir.) (concluding (i) "e-mail and Internet users, like the telephone users in *Smith*, rely on third-party equipment in order to engage in communication"; (ii) "e-mail to/from addresses and IP addresses constitute addressing information and do not necessarily reveal any more about the underlying contents of communication than do phone numbers"; and (iii) since "the pen register in *Smith* was able to disclose not only the phone numbers dialed but also the number of calls made," there "is no difference of constitutional magnitude between this aspect of the pen register and the government's monitoring here of the total volume of data transmitted to [the defendant's] account. Devices that obtain addressing information also inevitably reveal the amount of information coming and going, and do not thereby breach the line between mere addressing and more content-rich information."); *cert. denied*, 129 S.Ct. 249 (2008).

### C. Consent

But even if Yazzie had a reasonable privacy expectation in some or all of the information Ramirez retrieved from the cell phone call log, the search need not be suppressed because it was conducted after, and within the scope of, Yazzie's voluntary consent.

#### 1. Voluntariness

The Fourth Amendment protects against unreasonable searches and seizures, but a warrantless, consensual search, does not run afoul of the Constitution.[15] Consent must be voluntary, that is, it must not be the result of duress or coercion, express or implied.[16] The Government bears the burden of proving, by a preponderance of the evidence, that the consent was in fact voluntarily given and must show, based on the totality of the circumstances present, that the officer reasonably believed that the search was consensual.[17]

In evaluating the reasonableness of the officer's belief, a court must consider the characteristics of the person consenting, including that person's age, intelligence and education, whether he was under the influence of drugs or alcohol, whether he was informed of his right to withhold consent, and whether he was aware of rights afforded criminal suspects. The court must also consider the environment in which the alleged

---

[15]*Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973).

[16] 412 U.S. at 248.

[17]*United States v. Lopez-Mendoza*, 601 F.3d 861, 866 (8th Cir. 2010) (*citing United States v. Almendares*, 397 F.3d 653, 660 (8th Cir. 2005)).

consent took place, including the length of time the suspect was detained, whether (1) the police threatened, physically intimidated, or punished him; (2) the police made promises or misrepresentations; (3) he was in custody or under arrest when the supposed consent was given; (4) the consent occurred in a public or secluded place; and (5) he stood by silently -- as the search occurred.[18]

These factors, when applied to this case, and specifically, the April 16 and 17 cell phone searches, militate strongly in favor of voluntary consent. At the time the searches took place, Yazzie was 27 years of age, had obtained his GED and could read and write the English language. He had no mental or physical ailments and was not under the influence of any drugs or alcohol. He had been advised of his *Griffin*[19] rights and given other admonitions. His contacts with agents lasted between an hour and an hour and a half. At no time was he threatened, intimidated or punished and no promises or misrepresentations were made to him. And, notably, he not only handed the cell phone to Ramirez but also accessed the call log for Ramirez to examine.[20] The Government has sustained its burden and established that Yazzie's consent to the search was voluntary.[21]

---

[18]*United States v. Esquivias*, 416 F.3d 696, 700 (8th Cir. 2005) (citations omitted).

[19]*See United States v. Griffin*, 922 F.2d 1343, 1349-50 (8th Cir. 1990); *United States v. Running*, 698 F.Supp.2d 1186, 1192 (D.S.D. 2009).

[20]*See United States v. Murphy*, 552 F.3d 405, 408, 412 (4th Cir.) (initial search occurred after defendant gave trooper his cell phone and showed trooper how to use it in order to located the number for his employer), *cert. denied*, 129 S.Ct. 2016 (2009).

[21]*United States v. McGlothlin*, 391 Fed.Appx. 542, 545 (7th Cir. 2010).

### 2. Scope of the Search

But did Ramirez's search exceed the scope of the consent? The short answer is "no".

"The scope of a search is generally defined by its expressed object."[22] When measuring the scope of a consensual search, a court must determine what "the typical reasonable person [would] have understood by the exchange between the officer and the suspect."[23]

Here, Ramirez asked Yazzie for permission to look at Yazzie's cell phone call log. After giving consent, Yazzie handed Ramirez the phone with the call log in full view. Yazzie sat next to Ramirez and watched as Ramirez studied and made notes from the log. Yazzie never objected to the search or tried to retract or limit his consent. And, at no time did Ramirez ever try to expand the perimeters of his search and look at anything other than the log itself. Based on the evidence of record, the cell phone searches were within the bounds of the consent Yazzie gave to Ramirez.[24]

## THE APRIL 16 STATEMENTS IN THE VEHICLE WERE NON-CUSTODIAL

Yazzie next contends that his statements in LeBeau's vehicle on April 16 should be suppressed because agents did not first advise him of his *Miranda* rights. *Miranda* requires that law enforcement agents provide certain warnings before they conduct an interrogation

---

[22]*Florida v. Jimeno*, 500 U.S. 248, 251 (1991).

[23]*United States v. Brown*, 345 F.3d 574, 580 (8th Cir. 2003).

[24]*Maldonado*, 2009 WL 2760798 at *13.

of an individual who is in custody. Yazzie maintains that he was in custody when agents questioned him about A.U.K. and that he was thus entitled to receive *Miranda* warnings before they did so.

Law enforcement officers are not required to administer *Miranda* warnings to everyone whom they question.[25] Instead, "warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody'". It was *that* sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited.[26]

The "ultimate inquiry" in the custody determination "is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."[27] "Two discreet inquiries are essential to this determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he [ ] was not at liberty to terminate the interrogation and leave."[28] The custody inquiry turns on whether, given the totality of the circumstances, a reasonable person would have felt at liberty to terminate the interrogation and leave or cause the agents to leave.[29]

---

[25]*Oregon v. Mathiason*, 429 U.S. 492, 495 (1977).

[26]*Id.*

[27]*California v. Beheler*, 463 U.S. 1121, 1125 (1983) (*per curiam*) (internal quotation omitted).

[28]*Thompson v. Keohane*, 516 U.S. 99, 112 (1995) (footnote omitted).

[29]*United States v. New*, 491 F.3d 369, 373 (8th Cir. 2007).

While in the vehicle and before the interview began, Ramirez informed Yazzie that (1) he was not under arrest; (2) he was not going to be arrested immediately following the interview; (3) the decision to make an arrest could only be made by the United States Attorney's Office in the future; (4) at any time during the interview, he could leave or ask agents to leave the vehicle and could stop the interview; and (5) the interview was completely voluntary. Ramirez then asked whether Yazzie would be intimidated by being interviewed in a police car or having LeBeau in the back seat of it with an exposed firearm. Yazzie said that he wouldn't be and that it was okay to proceed.

While Yazzie's movement was somewhat limited because he was in a vehicle, he was never handcuffed or physically restrained and he was shown that the door, next to where he was sitting, was unlocked and could be opened at any time. Admittedly, agents did drive to Yazzie's home and initiated contact with him there. But Yazzie agreed to talk to them in the vehicle, as opposed to in the home, and did so. Agents did not employ any strong-arm tactics or deceptive stratagems to get Yazzie to talk or incriminate himself. The interview did not last long – a little more than an hour – and agents did not arrest Yazzie at the conclusion of it.

On balance, taking into consideration the totality of the circumstances, a reasonable person in Yazzie's shoes would not have understood that he was in custody at any time. Agents, therefore, were not required to warn Yazzie – before interviewing him – of his Fifth

Amendment privilege against self-incrimination and right to the assistance of counsel as required by Miranda.[30]

## THE STATEMENTS MADE ON APRIL 17 AT THE POLICE DEPARTMENT WERE NOT CUSTODIAL OR INVOLUNTARY

Yazzie further claims that statements he made, the morning of April 17, at the police department were "custodial and coercive". His claim is based on the custody aspect of *Miranda* – that a person is entitled to certain warnings before being subjected to custodial interrogation – and on the voluntariness component of the Fifth Amendment – that statements, to be admissible, must be voluntarily given – and seeks to suppress all of his statements.

### A. Custody

At the request of agents, Louise drove Yazzie to the police department in Eagle Butte. There, Yazzie met with agents in an inner conference room with more than one door leading in and out of it. At the outset, Ramirez advised Yazzie that Yazzie was not under arrest, that he would not be arrested at the end of the interview, that his participation in the interview was completely voluntary and that he could end the interview and leave at any time. Ramirez also showed Yazzie that the door Yazzie had entered through was open and told him that he could walk out and leave at any time the

---

[30] *See United States v. Plumman*, 409 F.3d 919, 924-25 (8th Cir. 2005); *United States v. Bordeaux*, 400 F.3d 548, 559-60 (8th Cir. 2005); *see also United States v. Iron Hawk*, No. CR 07-30094-01-KES, 2008 WL 3914519 at *5 (D.S.D. Aug. 20, 2008).

same way he came in. Later on, Ramirez advised Yazzie – a second time – that he was not under arrest and free to leave and told him that he did not have to answer questions or provide information. Yazzie had unrestrained freedom of movement in the room during the interview and was not subjected to any menace or trickery. He responded to questions asked of him and left, without being arrested, when the interview concluded.

A couple of observations regarding this interview should be made. First, Miranda warnings are not required "simply because the questioning takes place in the station house."[31] Second, some degree of coercion is part and parcel of the interrogation process and the coercive aspects of a police interview are largely irrelevant to the custody determination except where a reasonable person would perceive the coercion as restricting his or her freedom to depart.[32]

Whatever coercion may have existed in this case was not the sort that a reasonable person, in Yazzie's position, would perceive as restricting his ability to leave. Indeed, the facts – as depicted in part on the videotape – support the opposite conclusion. Yazzie was never physically restrained or placed in handcuffs. Ramirez informed Yazzie twice – before the interview commenced and about 60 minutes into it – that he could leave at any

---

[31] *Mathiason*, 429 U.S. at 495.

[32] *See Mathiason*, 429 U.S. at 495; *see also Stansbury v. California*, 511 U.S. 318, 324-25 (1994) (stating that an officer's suspicion concerning a suspect and purpose for conducting an interview bear on the custody determination "only if the officer's views or beliefs... would have affected how a reasonable person in that position would perceive his [ ] freedom to leave").

time. And ultimately, Yazzie left the police station without being arrested.[33]

This case is largely indistinguishable from *Mathiason* and *Beheler*.[34] Yazzie was not under arrest at the time of the interview and his freedom of movement was not restricted in a manner associated with a formal arrest. He was therefore not in custody, within the meaning of *Miranda*, and entitled to warnings before being questioned.[35]

**B. Voluntariness**

Statements to law enforcement authorities are voluntary if they are "'the product of an essentially free and unconstrained choice by [their] maker.'"[36] A statement is not involuntary unless "the police extort[ ] it from the accused by means of coercive activity."[37]

There is no proof – worthy of belief – that agents coerced Yazzie into making statements, or that his decision to meet with and talk to agents was the product of anything other than his own decision. Ramirez informed him that the interview was voluntary and

---

[33]*See United States v. Galceran*, 301 F.3d 927, 931 (8th Cir. 2002) (observing that the lack of arrest was a "very important factor weighing against custody").

[34]*See United States v. LeBrun*, 363 F.3d 715, 722 (8th Cir. 2004) *(en banc), cert. denied, 543 U.S. 1145 (2005); Thatsaphone v. Weber*, 137 F.3d 1041, 1044-46 (8th Cir.), *cert. denied*, 523 U.S. 1130 (1998); *Jenner v. Smith*, 982 F.2d 329, 335 (8th Cir.), *cert. denied*, 510 U.S. 822 (1993).

[35]*United States v. Black Bear*, 422 F.3d 658, 661-63 (8th Cir. 2005); *United States v. Brave Heart*, 397 F.3d 1035, 1038-40 (8th Cir. 2005); *see also United States v. Betone*, 686 F.Supp.2d 949, 952-54 (D.S.D. 2010); *Running*, 698 F.Supp.2d at 1191-93.

[36]*Schneckloth*, 412 U.S. at 225 (*quoting Culombe v. Connecticut*, 367 U.S. 568, 602 (1961)).

[37]*Jenner*, 982 F.2d at 333 (internal quotation omitted).

that he did not have to answer any questions. At no time did agents ever make any threats or promises to Yazzie or exert any pressure on him. Nor did they use any force or employ physical punishment to get him to talk. The duration, tone and overall atmosphere of the interview were not hostile or intimidating. Yazzie cooperated with agents – agreeing to be videotaped and providing reenactments for them – and continually proclaimed that A.U.K.'s injuries were unintentional. While with agents, Yazzie was not under the influence of alcohol or drugs and nothing he said or did indicated that he suffered from any form of mental incapacity. Considering all of the factors relevant to the voluntariness inquiry, the Government has proven, by a preponderance of the evidence, that Yazzie's statements were voluntary.[38]

## THE APRIL 17 STATEMENTS AT HOME WERE ADMISSIBLE UNDER *MIRANDA* AND VOLUNTARY

Ever vigilant, Yazzie argues that his statements to agents at the house -- later in the day on April 17 – were elicited in violation of Miranda and the Fifth Amendment. He claims that he was in custody at the time he made his statements – and never given *Miranda* warnings – and that the statements were involuntary.

He supplements these claims with an additional argument in support of suppression: that agents broke their promise not to arrest him if he gave statements about the A.U.K. incident. He points to Ramirez's assurance – that he "was not going to be

[38] *LeBrun*, 363 F.3d at 724; *United States v. Astello*, 241 F.3d 965, 966 (8th Cir.), *cert. denied*, 533 U.S. 962 (2001) ; *see also United States v. Reynolds*, No. CR 09-106-RAL, 2010 WL 1782161 at **3-4 (D.S.D. April 28, 2010); *Running*, 698 F.Supp.2d at 1193-96.

arrested immediately following the interview" – and the fact that shortly after the interview ended, he was arrested and charged with two tribal offenses. He contends that his arrest is probative evidence that he was in custody at the time he was interviewed. He also maintains that he was given a deceptive promise that motivated him to confess.

### A. Custody

Yazzie was informed, at the beginning of the interview, that he was not under arrest, that he could stop the interview and leave at any time.[39] He also said he understood that the interview was completely voluntary.[40] He was questioned in his own home, a location "that is not indicative of the type of inherently coercive setting that normally accompanies a custodial interrogation."[41] The questioning was brief – 15 to 20 minutes long – and he

[39]*See New*, 491 F.3d at 373-74 ("the most obvious and effective means of demonstrating that a suspect has not been taken into custody is for police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will"); *United States v. Ollie*, 442 F.3d 1135, 1137 (8th Cir. 2006) ("[A]n explicit assertion that the person may end the encounter . . . generally removes any custodial trappings from the questioning."). *Brave Heart*, 397 F.3d at 1039 ("no governing precedent of the Supreme Court or this court has yet held that a person was in custody after being 'clearly advised of his freedom to leave or terminate questioning'") (citations omitted).

[40]*Brave Heart*, 397 F.3d at 1039 (stating that it is "highly significant" that the defendant was told, at the outset of the interview, that his presence was voluntary – information that he actually understood).

[41]*United States v. Czichray*, 378 F.3d 822, 826 (8th Cir. 2004), *cert. denied*, 544 U.S. 1060 (2005); *see also United States v. Axsom*, 289 F.3d 496, 502 (8th Cir. 2002); *United States v. Sutera*, 933 F.2d 641, 647 (8th Cir. 1991).

was not "restrained, threatened or coerced."[42] Significantly, he was not arrested at the end of the interview and agents left the house and drove away.[43]

Whether or not LeBeau actually intended to arrest Yazzie that day does not matter. LeBeau did not articulate any arrest plans to Yazzie during the interview or say anything that was inconsistent with what Ramirez had told Yazzie when the interview began. This fact is an important one and militates strongly against any custody finding.[44]

Nothing occurred during the interview that was sufficient to make a reasonable person in Yazzie's position doubt the continued efficacy of Ramirez's original advisement regarding voluntary participation.[45] Yazzie, therefore, was not in custody at the time he made his statements to agents.

**B. Voluntariness**

Yazzie's interview was short, lasting well under half an hour. He freely responded to questions posed to him and demonstrated for agents what all went on with A.U.K. He was a mature adult at the time, conversant in English, and did not appear to have any difficulty understanding the agents or any of their inquiries. His responses, both verbal

---

[42]*United States v. Vinton*, No. 09-3323, 2011 WL 31526 at *2 (8th Cir. Jan. 6, 2011).

[43]*See United States v. Carlson*, 613 F.3d 813, 817 (8th Cir. 2010) (*citing Griffin*, 922 F.2d at 1349 and emphasizing that officers "did not arrest [the defendant] at the end of the meeting"), *cert. denied*, 2011 WL 197752 (U.S. Jan. 24, 2011) (No. 10-8062).

[44]*Brave Heart*, 397 F.3d at 1039; *Griffin*, 922 F.2d at 1356; *see also Berkemer v. McCarty*, 468 U.S. 420, 442 (1984).

[45]*Brave Heart*, 397 F.3d at 1040.

and demonstrative, were logical and understandable. He was also sober – free of alcohol and drugs – at the time. And, he said he understood the "voluntary nature" of the interview.

It is true Yazzie was advised that he would not be arrested at the conclusion of the interview and that any arrest decisions would be made by the United States Attorney's Office later on. At no time though was he told that he would never be arrested or prosecuted for any offense or given any promises of immunity.[46] Nor was he arrested "immediately following" the interview, but two hours later, after agents had departed (and in the case of one of them, left town).

Yet even if viewed as misleading, a promise by law enforcement officers does not necessarily make a suspect's later-in-time statements involuntary. Rather, it is simply one factor to be considered in the totality of the circumstances.[47]

Ramirez's so-called "promise" not to arrest Yazzie when the interview ended was not sufficient to overbear Yazzie's will and to render his statements involuntary. First, it is difficult to discern how Yazzie was motivated to confess by such a promise when he

---

[46]*United States v. Stacy*, No. S1-4:09 CR 06-05RWS (AGF), 2010 WL 2039660 at *18 (E.D. Mo. May 21, 2010); *see also United States v. Estey*, 595 F.3d 836, 839 (8th Cir.) (holding that statement to defendant that he was not under arrest and would not be arrested at the end of the interview was not a promise of total immunity), *cert. denied*, 130 S.Ct. 3342 (2010).

[47]*Brave Heart*, 397 F.3d at 1041 ("'even assuming that a reasonable person would view [the officer's] statements as a promise, a promise made by law enforcement does not render a confession involuntary per se.'") (*quoting LeBrun*, 363 F.3d at 725 (internal quotations omitted)).

himself never acknowledged that it was made or exhibited any indicia of detrimental reliance.[48]

Second, law enforcement officers routinely use a variety of tactics in conducting interviews of suspects, including making false promises and engaging in deception. "None of these tactics render a confession involuntary unless 'the overall impact of the interrogation caused the suspect's will to be overborne.'"[49] The record as a whole demonstrates that Yazzie cooperated with agents because he wanted to, not because the environment and nature of the questioning – including any "promise" not to arrest him – were so coercive that they overbore his will and critically impaired his capacity for self-determination.[50]

Third, Ramirez – the alleged "promisor" – never arrested Yazzie; instead, it was LeBeau who decided on his own to do so – under tribal law – after due consideration of the circumstances present. LeBeau testified that during the interview, he had no plans to arrest Yazzie, but changed his mind after the interview ended based on safety concerns he had for the other children in the home and Yazzie himself, and the fact that Yazzie had no place

---

[48]*Brave Heart*, 397 F.3d at 1041 ("it is illogical to conclude that [the defendant] was motivated to confess by such promises if he did not himself acknowledge that they were made").

[49]*Id.* (*quoting Jenner*, 982 F.2d at 334).

[50]*Brave Heart*, 397 F.3d at 1041.

to go – other than to return to the home – and had talked about leaving the area and going to Arizona.[51]

Finally, the facts in this case weigh more heavily in favor of voluntariness than those in *Brave Heart*. There, the defendant was given assurances – substantively the same as those made to Yazzie – and was arrested by tribal authorities 20 minutes after the interview ended and then by federal authorities about an hour or so after that.[52] Before arresting the defendant, the FBI agent consulted with and obtained authority from an Assistant United States Attorney.[53] If the Eighth Circuit was able to find that the defendant's confession in *Brave Heart* was voluntary, it surely would find that Yazzie's statements were voluntary as well.

There is no credible evidence that agents coerced or induced – with a promise or otherwise – Yazzie into making statements or that his decision to assist agents was the product of anything other than a free and unconstrained choice.[54] His statements and demonstrations – made during the interview – are therefore admissible at trial.

---

[51]*See Estey*, 595 F.3d at 839 (FBI agent's statement that the defendant would not be arrested at the end of the interview was not a promise of total immunity nor an assurance precluding future prosecution); *Stacy*, 2010 WL 2039660 at **18-19 (deputy's "promise" of leniency was not in fact untrue, but even if deceptive, it did not overbear the defendant's will and critically impair his capacity for self-determination).

[52]*Id.* at 1039.

[53]*Id.*

[54]*Id.* at 1041; *see also Estey*, 595 F.33d at 839; *LeBrun*, 363 F.3d at 725-26; *United States v. Kilgore*, 58 F.3d 350, 353 (8th Cir. 1995); *United States v. Wilson*, No. 4:10 CR 75 RWS, 2010 WL 2835729 at *5 (E.D. Mo. June 4, 2010), *report and recommendation adopted by*, 2010 WL 2835725 (E.D. Mo. July 16, 2010).

## NO POISONOUS TREE OR TAINTED FRUIT

Yazzie's exclusionary rule claims can be easily disposed of. Because agents did not engage in unlawful conduct or violate any of his Yazzie's rights, there is no "poisonous tree" or "tainted fruit" in play. This being the case, Yazzie's *Mapp*[55] and *Wong Sun*[56] claims have no evidentiary foundation and must necessarily fail.

## CONCLUSION

Agents did not violate Yazzie's Fourth and Fifth Amendment rights or the dictates of *Miranda* so as to require the suppression of his call log data, statements, and demonstrative reenactments. He had no reasonable expectation of privacy in the log of his cell phone, but even if he did, the search of it was consensual. As far as the interviews are concerned, Yazzie willingly participated in them and provided agents with information regarding the injuries that A.U.K. sustained while he cared for her. He was not in custody during these interviews. And, his statements to agents were voluntary. So too were his reenactments for agents. No basis exists to exclude this evidence. Yazzie's suppression motion should thus be denied.

## RECOMMENDATION

Accordingly, it is hereby

---

[55]*Mapp v. Ohio*, 367 U.S. 643 (1961).

[56]*Wong Sun v. United States*, 371 U.S. 471 (1963).

RECOMMENDED that Yazzie's motion to suppress, including the supplement to it,[57] be denied in its entirety for the reasons stated in this Report.

**NOTICE**

An aggrieved party must file written objections, within fourteen (14) days, in order to attack this Report and Recommendation before the assigned United States District Judge.[58]

Dated this 25th day of January, 2011, at Pierre, South Dakota.

**BY THE COURT:**

s/ Mark A. Moreno

**MARK A. MORENO**
**UNITED STATES MAGISTRATE JUDGE**

[57] See Docket Nos. 29, 30, 43.

[58] *See* 28 U.S.C. § 636(b)(1).